**AFFIDAVIT OF SPECIAL AGENT JOHN WALKER IN SUPPORT OF
AN APPLICATION FOR A COMPLAINT**

I, John Walker, state:

### *INTRODUCTION AND AGENT BACKGROUND*

1.  I am a special agent of the Federal Bureau of Investigation (FBI) and have been so
    employed for 26 years. I have investigated a broad variety of criminal and national
    security violations, have conducted well in excess of one thousand interviews, and have
    successfully employed diverse investigative techniques and tools.

2.  I am currently investigating Mason Stickney, YOB 1997 ("Stickney"), currently
    incarcerated at the Essex County Correctional Facility ("ECCF"), Middleton,
    Massachusetts, for using a facility of interstate commerce with the intent that murders be
    committed in violation of the laws of Massachusetts and New Hampshire as
    consideration for the receipt of, or as consideration for a promise or agreement to pay,
    something of pecuniary value ("murder-for-hire"), in violation of Title 18, U.S.C.,
    Section 1958.  This affidavit is submitted in support of an application for a complaint
    charging Stickney with said offense.

3.  The facts in this affidavit come from my personal observations and review of records, my
    training and experience, and information obtained from other agents and witnesses. This
    affidavit is intended to show merely that there is probable cause for the requested
    complaint and does not set forth all of my knowledge about this matter.  To the extent I
    describe conversations, I do so in part and in substance.

### *PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED*

4.  On October 30, 2017, I met with a sergeant of the Massachusetts State Police ("MSP"),
    who, on October 27, 2017, interviewed another ECCF inmate (hereinafter

"Complainant"),[1] who furnished on a confidential basis information concerning inmate Stickney's articulated desire to murder a Massachusetts municipal police officer (hereinafter "Police Officer"), a young Essex County, Massachusetts, man believed by Stickney to be enrolled in a college (hereinafter "Student"), and the owner of a New Hampshire restaurant (hereinafter "Restaurateur"). According to the MSP, Complainant also furnished that agency with information that Stickney had articulated a desire to kidnap and assault an Essex County Assistant District Attorney (hereinafter "ADA").

5. I have listened to the audio recording of MSP's October 27 interview of Complainant, conducted in the presence of his counsel. During that interview, Complainant told MSP that, approximately two and one-half to three weeks earlier, Stickney approached Complainant inside their common ECCF housing unit and inquired as to his ability to obtain a "silencer." According to Complainant, Stickney told him that he was aware that Complainant was a "serious" individual in whom Stickney could confide. Thereafter, during roughly 30 face-to-face conversations within ECCF continuing through the evening of October 26, 2017, Stickney reportedly solicited Complainant's assistance to commit the aforementioned murders and kidnapping in consideration of Stickney furnishing Complainant money, as well as in agreeing to commit murders in

---

[1] Complainant has a lengthy criminal history with adult convictions going back to 1989. The convictions include, but are not limited to, a 1990 conviction for armed robbery, for which he was sentenced to 7-10 years; a 1992 conviction for rape of a child, for which he was sentenced to 6-10 years; and other convictions for which he received lesser sentences, including but not limited to 1999 convictions for assault and battery on a household member, assault and battery ("AB"), threatening to kill, and impersonation; 2005 convictions for AB and assault and battery with a dangerous weapon ("ABDW"); 2014 convictions for shoplifting; and 2016 convictions for assault and battery on a household member.  Complainant is currently being held pretrial on multiple AB and ABDW charges.

Complainant's behalf upon Stickney's release from jail. Complainant told MSP that he continued conversations with Stickney in this regard because he was troubled by Stickney's criminal intentions and wished to garner sufficient information to permit disruption of his plans.

6. According to information furnished by Complainant during the MSP interview, Stickney solicited Complainant's assistance to identify, locate and kidnap ADA, a woman assigned to prosecute Stickney whose name was ultimately furnished to Stickney by his attorney. According to Complainant, Stickney wanted the ADA "kidnapped and put in a trunk, and the hell scared out of her;" "hit her in the body, hit her in places that her face couldn't be seen;" and "her to be aware that he [Stickney] wanted a year or under on his sentence."

7. Complainant further advised MSP that Stickney had solicited him to murder a police officer in Essex County who had arrested and otherwise bothered a member of Complainant's family. Stickney told Complainant that he wanted the officer shot in the face to prevent his family from displaying his remains. According to Complainant, Stickney furnished him details about the officer, including regarding his residential address.

8. Complainant also advised MSP that Stickney had solicited him to murder a "college kid" whom Stickney identified by name.

9. According to my review of the recording of the MSP interview, Complainant also told Stickney that Complainant successfully employed a method of bypassing ECCF's monitored inmate telephone system which allowed him to place calls to numbers outside the facility without recording or monitoring by correctional staff. Complainant also

reportedly informed Stickney that Complainant's friend gains access to the facility for unmonitored visits with Complainant by falsely identifying himself as an attorney.

10. Finally, Complainant informed MSP that Stickney had passed him notes detailing the crimes he wished to have committed. On November 2, 2017, MSP provided the FBI with the originals of these notes reportedly generated by Stickney, as well as the originals of notations which Complainant told MSP he prepared when discussing these matters with Stickney. MSP advised that it received these materials from Complainant and his attorney on October 27, 2017.

11. On November 2, 2017, another FBI special agent and I met with Complainant and his attorney. My colleague and I obtained Complainant's written consent to record his future conversations with Stickney inside ECCF, and demonstrated for Complainant how to operate the electronic recording device to be furnished by the FBI for this purpose. Finally, my colleague and I provided Complainant with the telephone number of a third FBI special agent, operating in an undercover capacity (undercover employee – hereinafter "UCE"), whom Complainant could identify to Stickney as his friend from outside ECCF who accessed the facility under the false pretense of being a lawyer. Complainant stated that he would provide the number to Stickney, inform Stickney that he could dial the number from inside ECCF without concern that his conversations would be monitored or recorded, and tell him that Complainant's friend could assist Stickney with his criminal intentions.  (In fact, however, the calls would be recorded.)

12. A supervisor of the Essex County Sheriff's Office (ECSO), which operates ECCF, has informed me that, on November 3, 2017, at approximately 7:10 a.m., he provided Complainant with the FBI's electronic recording device.

4

13. ECSO has furnished the FBI copies of audio tape recordings, with an accompanying written index, of telephone calls placed by Mason Stickney, Massachusetts Sheriff's Association ("MSA") Number 0713012, from monitored inmate telephone(s) inside his assigned ECCF housing unit, "VOKE-1," to persons outside the facility for the period October 1, 2017, through November 5, 2017. Based on my experience investigating crimes having nexus to ECCF, I am aware that calls initiated by ECCF inmates to persons outside the jail involve use of a facility of interstate communication. The written index provided by ECCF lists a call initiated by Stickney on November 3, 2017, at approximately 10:20 a.m., during which he accessed the computerized account application of ECCF's telephone vendor. An ECSO supervisor has informed me that inmates dial the number of this account application for the purpose, in part, of adding or deleting telephone numbers to which they are permitted to communicate, and that an inmate accesses the application by entering his unique seven-digit MSA number, in combination with his unique four-digit personal identification number ("PIN"). I have listened to the brief (27-second) audio recording generated in connection with this call, wherein a recorded message of ECCF's telephone vendor confirms that the caller added to his inmate account the telephone number of the FBI UCE previously furnished Complainant by the FBI.

14. I have also listened to a call initiated from inmate telephone number 3 within VOKE-1 on November 3, 2017, at approximately 10:46 a.m. (in excess of 19-minutes duration), to the UCE's undercover telephone number. The male, who initiated the call using Stickney's MSA number and four-digit PIN, identified himself as "Mason Allen," promptly greeted the UCE by the first name for the UCE supplied to Complainant by the FBI, and replied

5

in the affirmative to the UCE's question as to whether the caller was associated with Complainant. An ECSO supervisor has informed me that ECCF video surveillance of the vicinity of this inmate telephone on the morning of November 3, 2017, depicts inmate Mason Stickney placing this call (although the telephone and video surveillance systems, operated by two separate vendors, are not precisely synchronized – the ECSO supervisor informed me that there appears to be a roughly-three-to-four minute deviation).

15. During this November 3, conversation, Stickney, who accurately stated his correct Byfield street address, told the UCE, "First, I need you to grab the DA's niece and nephew, torture them if you don't mind, strip them nude basically, and tie them up and record them saying 'Aunt [first name of ADA], help me!', like little fucking bitches, and then, just you know, kill them after but don't tell her you killed them." Mason further instructed the UCE to "show her the video, tell her I want no more than a year and if she snitches or if she gives me more than a year the kids die." Stickney provided the UCE the full name and current court assignment of ADA, which I know to be accurate based on information provided by Essex County officials.

16. Later during the same November 3, 2017, call to the UCE, Stickney furnished the full name of Restaurateur, the name and location of his business, and two New Hampshire towns Stickney believes he may reside in. Based on open-source queries, I am aware that a person having Restaurateur's name is, in fact, associated with the management of the identified restaurant. Stickney requested that UCE shoot Restaurateur using a silencer, cut off his hands and retain them in plastic, and dispose of Restaurateur's body at sea. Stickney further requested UCE to use Restaurateur's severed hands to leave latent

fingerprints on a separate firearm to ambush and murder Police Officer, whose full name Stickney accurately furnished to UCE, albeit phonetically.

17. During the same November 3rd call, Stickney requested UCE to locate Student, whose full name and residential address Stickney accurately provided based on government reports and open-source materials I have reviewed, to shoot and decapitate him, and to similarly dispose of his body at sea.

18. Finally, the recording of the November 3rd call captures Stickney informing UCE that, in consideration of his assistance in committing the aforementioned crimes, Stickney promised to pay the UCE $10,000 upon his release from jail, as well as to "get rid of three people for you guys."

19. During the November 3rd call Stickney also solicited UCE's assistance in removing a computer hard drive from his home, saying, among other things, that there is "a lot of weird, messed-up, and incriminating shit on there."

20. On November 6 and 8, 2017, with the concurrence of ECSO management, and continuing to act in an undercover capacity, UCE visited with Stickney at the facility under the guise that UCE had gained access through presentation of fake credentials of a licensed attorney. During the November 8 contact, which the UCE recorded, the UCE displayed to Stickney a photograph of Police Officer which I took the previous day as Police Officer exited his department. Stickney identified the man depicted in the photograph by Police Officer's correct first name. Morever, he repeated, in substantially similar or identical detail, the murders and other crimes for which he solicited UCE's assistance.  During the meeting on November 9 UCE asked Stickney how he knew that the ADA had a niece and nephew and Stickney indicated that Complainant had told him.

21. On the afternoon of November 7, 2017, an ECSO supervisor retrieved the FBI's
    electronic recording device from Complainant, returning it to the FBI. I have listened to a
    total of five separate recordings present on the device upon retrieval. The recordings
    capture the voice of Complainant, which I recognize from our face-to-face interaction,
    and a male who states that the name on his identification card is "Mason Stickney." The
    voice of Stickney is identical to the voice captured on calls placed from ECCF, including
    to the UCE, using Stickney's unique MSA and PIN numbers. Although the recordings do
    not include specific reference by either Complainant or Stickney to the date(s) and
    time(s) of the recordings, nor does the recording device separately capture that data,
    references during the conversations suggest to me that the first recording was generated
    on the morning of November 3, 2017, shortly before Stickney caused the UCE's
    telephone number to be added to his telephone call list at approximately 10:20 a.m.; the
    second recording generated the same morning, shortly before Stickney initiated the
    aforementioned call to the UCE at approximately 10:46 a.m.; and the third recording
    upon conclusion of that call.

22. During the first two of these consensually-recorded conversations between Stickney and
    Complainant, Stickney repeated, in substantially similar or identical detail, the murders
    and other crimes for which he solicited UCE's assistance. During the first conversation,
    Stickney told Complainant that he uses the name "Mason Allen" on his Facebook profile.

23. Based on the foregoing, I believe probable cause exists to believe that Mason Stickney used and caused to be used a facility of interstate commerce with the intent that murders be committed in violation of the laws of Massachusetts and New Hampshire as consideration for the receipt of, and as consideration for a promise or agreement to pay, something of pecuniary value, in violation of 18 U.S.C. § 1958.

_____
JOHN WALKER
Special Agent, FBI

Subscribed and sworn to before me this 9th day of November, 2017.

_____
M. PAGE KELLEY
United States Magistrate Judge

9